# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN THE MATTER OF THE ESTATE )
OF GEORGE WROTEN CORDRAY )
and ROBERT L. LANE, ) C.A. No. 2022-0614-SG
ADMINISTRATOR FOR THE ESTATE )
OF GEORGE WROTEN CORDRAY )

## OPINION

Date Submitted: May 8, 2023
Date Decided: May 19, 2023

Gerald I. Street of STREET & ELLIS, P.A., Dover, Delaware, *Attorneys for Petitioner, the Estate of George Wroten Cordray and Robert L. Lane, Estate Administrator*.

Deirdre A. McCartney of SERGOVIC CARMEAN WEIDMAN MCCARTNEY & OWENS, PA, Georgetown, Delaware, *Attorneys for James Roy Wroten*.

Cynthia L. Maxwell Masters, *Pro Se*.

Diane Elaine Maxwell Tori, *Pro Se*.

Beverly Anne Maxwell Miller, *Pro Se*.

**GLASSCOCK, Vice Chancellor**

Almost seventy years ago, on August 4, 1955, a tragedy occurred. Norris Cordray killed his wife, Emma,[1] then himself. A child of that marriage, George, a resident of New Castle County, passed away in 1988, intestate. An estate was opened in 1988; for reasons not pertinent here, the estate remains open. Last July, the administrator of George's estate, Robert Lane (the "Administrator") brought the Petition for Instructions at issue here.[2] The Petition seeks instructions as to George's heirs, a matter to be determined under the Delaware statutes concerning intestate succession, set out at Chapter 5 of Title 12.[3] George died without a wife, and without issue. He had a lone sibling, a brother, Norris Jr., living at the time of his death, who is now himself dead—Norris Jr. ostensibly renounced his interest in George's estate and then died without issue.[4] George had no other siblings. Accordingly, Section 503(4) is applicable: "If there is no surviving issue, parent or issue of a parent, then to the next of kin of the decedent, and to the issue of a deceased next of kin, per stirpes."[5] "Next of kin" means "nearest blood relations [as] determined by tracing

---

[1] I use first names for those surnamed "Cordray." Clarity is the object, and no familiarity or disrespect is intended.

[2] Pet. Instructions, Dkt. No. 1.

[3] *See* 12 *Del. C.* §§ 501 *et seq.*

[4] This Court adjudicated George's only sibling, Norris, Jr., to be deceased in a related action. *In re Cordray*, 2022 WL 293012 (Del.Ch.); Pet. Instructions Ex. F. George died before Norris, Jr., who was at the time his next of kin—I need not address the issue of Norris, Jr.'s estate for three reasons: first, the matter is not addressed in the Petition for Instructions; next, Norris, Jr. purportedly renounced any interest in George's estate; and third, Norris, Jr. died, presumably, intestate, unmarried and without issue; his next of kin taking his estate would be identical with those I find to be George's next of kin here, so it is immaterial to the questions posed in the Petition for Instructions whether George's estate flows through that of Norris, Jr.

[5] 12 *Del. C.* § 503(4).

the decedent's family back to the closest forbear[er or forebearers] who ha[ve] living descendants and then tracing forward to those descendants."[6]  In other words, a decedent's next of kin are determined by counting up to the nearest common ancestor or ancestors of living relatives; the living issue of that progenitor or those progenitors take, per stirpes.[7]  This rule of intestate succession is meant to supply the presumed intent of the decedent, where the decedent has failed to provide otherwise by testament.

Here, a genealogical search was conducted, and discloses that George's next of kin are descendants of his grandparents Roy Wroten and Viola Shull through Emma's (mother's) lineage, and grandparents George and Mary Cordray through Norris's (father's) lineage.[8]  Obviously, these progenitors are at the same level of consanguinity to George.  Under the statute, accordingly, the living descendants of George's grandparents are the heirs of George and take the estate per stirpes.[9]

---

[6] *In re Estate of Wright*, 1997 WL 124149, at *2 (Del. Ch. Mar. 10, 1997) (citing *In re White's Estate*, 37 A.2d 167 (Del. Orph. 1944).

[7] *Matter of Estate of Smith*, 467 A.2d 1274, 1276 (Del. Ch. 1983) (interpreting 1 *Del. C.* § 302(9)).

[8] Pet. Instructions Ex. G.

[9] I base this determination on an exhibit to an affidavit filed by the genealogical surveyor.  *See* Pet. Instructions Ex. G. at Ex. A–B.  The final order in this matter should provide the list of heirs and their relative shares of the estate.  "[I]n cases of intestacy the persons entitled must be ascertained as of the time of the testator's death."  *Bedyk v. Bank of Del.*, 176 A.2d 196, 198 (Del. 1961).  The heirs' rights vested as of the time of George's death, and this rule should inform the form of order I ask the Administrator to submit, *infra*.

The twist in this matter involves the so-called "Slayer Statute,"[10] a codification of a common-law precept; that one must not profit from his own wrong.[11] The problem addressed by the Slayer Statute is that a slayer, as a survivor of the victim, might inherit, under a will or by intestacy; or might otherwise benefit from the killing.[12] This inequity is elegantly solved under the Slayer Statute, by a statutory fiction. "The slayer shall be deemed to have predeceased" the victim for purposes of inheritance.[13] As stated above, George's father Norris killed his mother Emma, then himself. Emma predeceased in fact, but for inheritance purposes Norris is deemed to have died first. The Slayer Statute also serves the rationale of the statutes of intestate succession, since it is unlikely that a decedent would want her slayer to receive the bounty of her estate.

On its face, the Slayer Statute has no application to the legal question before me. The next of kin are determined by consanguinity, by counting generations; the question of which ancestor died first does not enter into this calculation, the results of which in the case of George's estate are laid out above. The Administrator raises a novel approach to the Slayer Statute and the interests that underlie it, as supplied

---

[10] 12 *Del. C.* § 2322.

[11] S*ee Welch v. Welch*, 252 A. 2d 131 (Del. Ch. 1969).

[12] In addition to its application to rights otherwise inuring to a slayer from a victim's estate, testate or intestate, or from a trust, the Slayer Statute addresses property held jointly or by the entireties, vested and contingent remainder interests, and "proceeds passing by designation" (such as insurance benefits). 12 *Del. C.* § 2322.

[13] 12 *Del C.* § 2322(b) (intestate rights), (c) (wills and trusts).

by the common law, however. He asserts that, on account of slaying Emma, Norris not only is prohibited from benefiting from Emma's estate; the heirs of his lineage (and, pertinently, the lineage of Norris's parents) are likewise precluded from inheriting from Emma's issue.[14] This, I take it, is a matter of first impression in Delaware.

The statute itself cannot support this analysis. Here, Norris is deemed to have predeceased Emma, but this does not defeat the inheritance by George's next of kin who happen to share a common lineage with Norris. Nor do I find the caselaw preceding the enactment of the statute in 1993 to support the position of the Administrator. In *Colton v. Wade*, the Chancellor found that where a wife had murdered her husband, the resulting vesting, in her, of the estate formerly held by husband and wife by the entireties was subject to a trust in favor of husband's heirs.[15] *Welch v. Welch* extended that rationale to the estate of a slayer.[16] As here, in *Welch* a husband slew his wife, then committed suicide.[17] The former entireties estate vested in husband, then his estate (or the beneficiaries under his will), but the equities of the slayer doctrine dictated that the property be subject to a trust in favor of wife's alternative beneficiaries under her will.[18]

---

[14] Pet. Instructions ¶ 9; Letter to the Ct. from Pet'r's Counsel 2, May 3, 2023, Dkt. No. 15.
[15] 80 A.2d 923 (Del. Ch. 1951).
[16] 252 A. 2d 131 (Del. Ch. 1969).
[17] *Id.* at 132.
[18] *Id.* at 133. The slaying husband in *Welch* was the primary beneficiary under the will of wife, so the alternative beneficiaries under the will were the beneficiaries of the trust. *Colton* and *Welch*

4

The Superior Court reached a similar conclusion with respect to insurance proceeds, in *Maneval v. Lutheran Brotherhood*.[19]  In that case, wife was primary beneficiary of husband's life insurance when she shot him to death; pursuant to the slayer doctrine, she was deemed to have predeceased husband, and his contingent beneficiaries received the proceeds.[20]  In *In re Estate of Cohen*, the Chancellor affirmed a Master's Report concerning property held by a husband and wife killed by their son.[21]  The parents both died intestate; the slayer was their only heir.[22]  The son was charged with his parents' murder, and pled "guilty, but mentally ill."[23]  In such a case "[t]he [slayer] must be deemed to have predeceased [the victims]," and the property passed to parents' heirs (excluding the son, who was considered to have predeceased) on that basis.[24]

In other words, under the (thankfully sparse) case law, the slayer doctrine applies to property that would otherwise go to the slayer himself, or his estate.[25]

---

employed the trust remedy, presumably, because of the peculiar nature of entireties property, held *per tout et non per my. See, e.g., Carlisle v. Parker*, 188 A. 67, 70 (Del. Super. Ct. 1936) ("Joint tenants hold by moieties . . . .  A husband and wife have no moieties—they are seized "per tout" but not "per my"; each has an entirety in the subject of the estate . . . .").  In other words, strictly speaking, the slain spouses held no individual interests in the property prior to their murders.

[19] 281 A.2d 502 (Del. Super. Ct. 1971).

[20] *Id.* at 504.

[21] 1993 WL 1502698 (Del. Ch. Mar. 3, 1993).

[22] *Id.* at *1.

[23] *Id.*

[24] *Id.* at *2.

[25] *See also Matter of Estate of Cohen*, 1995 WL 106314, at *5 (Del. Ch. Feb. 10, 1995) (noting that Slayer Statute codified the slayer doctrine, under which insurance proceeds could not flow to slayer/beneficiary); *Reliance Standard Life Ins. Co. v. Ross*, 2009 WL 159184, at *1 (D. Del. Jan.

Here, the estate in question is that of George, who is not a slayer; and *not* the estate of his father Norris. No Delaware case supports employing the slayer doctrine to disinherit next of kin, with the exception of the slayer himself, or those who would take through the slayer's estate.

Nonetheless, the Administrator points out that the Slayer Statute provides that "[t]his section . . . shall be construed broadly in order to effect the policy of this State that a person shall not be permitted to profit by that person's own wrong."[26] The Administrator argues that allowing George's next of kin to take through the lineage of Norris would do just this. Moreover, any different decision here would "tempt" would-be slayers to murder for the benefit of their heirs.[27]

But this concern is not cogent here. The next of kin taking through the lineage of George's father are in no way profiting from Norris's evil act. Such an unconscionable benefit to a murderer, or his estate, is the wrong addressed by the slayer doctrine, at common law and by statute. The kin of Norris do not so benefit here, because it is immaterial under the intestacy statute whether Norris survived or predeceased Emma. Because the slaying has no effect in the current situation, there is no reason to construe Section 2322 to do anything other than what it explicitly

---

21, 2009) at *1 (slayer/beneficiary of insurance policy treated as predeceasing victim under the Slayer Statute).

[26] 12 *Del. C.* § 2322(k).

[27] Letter to the Ct. from Pet'r's Counsel 2.

calls for—to deem Norris as the predecessor of Emma—which, again, has no effect on the issue before me.

Likewise, the Administrator points to language in *Welch* addressing application of the common-law slayer doctrine, stating that "not only is the wrongdoer to be treated as though he had predeceased his spouse but the rights and interests of other persons, whether as heirs [or] next of kin . . . *are to be determined upon that premise.*"[28] The Administrator points out that *Welch* was not overruled by the enactment of the Slayer Statute, and argues that the quoted language is exactly what the General Assembly had in mind when providing that Section 2332 should be construed broadly. I do not disagree.[29] For instance, if husband kills wife, he cannot inherit from wife.[30] If husband then kills himself, his estate, and via his estate his beneficiaries or next of kin, also cannot inherit from wife. That is because the rights of husband's estate must be "determined upon the premise" that husband predeceased.[31] The husband's estate, and its beneficiaries, are thereby disabled from

---

[28] 252 A.2d at 132–33 (emphasis added).

[29] The legislative history does not disclose the reason for specifying that the Slayer Statute should be broadly construed. However, I note that the statute was codifying a flexible common-law doctrine designed to ensure that wrongdoers not profit thereby; presumably, the "broad construction" language was an attempt to preserve flexibility to achieve that desired result.

[30] Thus, Norris was precluded from inheriting from Emma.

[31] *See Welch*, 252 A.2d at 132–33. I note that this application of the doctrine does not exclude husband's next-of-kin inheriting from *Wife's estate*—rather than through the estate of the slayer— if husband's next of kin happen to be so entitled. For example, if husband/slayer is deemed to predecease wife/victim, her beneficiaries are determined on that basis; thus in this example children of the couple could inherit directly from mother's estate, but not through father.

benefiting due to the husband's evil act.  But that is not the situation here.  The kin of Norris who happen to be next of kin of George *are not* inheriting from Norris's estate,[32] and are not benefiting from Norris' actions.

The next of kin of George in Norris's lineage are inheriting from George because under the statute of intestacy they are entitled to, and would be regardless of the slaying. Emma and Norris were born in 1905 and 1904, respectively.[33]  Had they lived out their biblical span of three score and ten, then passed away peacefully in the mid-1970s, the heirs of George would be exactly the same as determined here.  Allowing those heirs to inherit therefore gives no incentive to murder, the Administrator's argument notwithstanding.

The Slayer Statute is expressly non-penal in nature.[34]  Since George's next-of-kin are innocent of wrongdoing in the murder of Emma, *and* because they do not stand to benefit from her murder, disinheriting them as the Administrator suggests would be punitive.  Such would be inconsistent with the text of the Statute and its animating spirit.[35]

---

[32] An estate presumably closed more than 65 years ago.

[33] Pet. Instructions Ex. G. at Ex. A–B.

[34] 12 *Del. C.* § 2322(k).  The underlying doctrine is also nonpunitive. *See* Karen J. Sneddon, *Should Cain's Children Inherit Abel's Property?: Wading into the Extended Slayer Rule Quagmire*, 76 UMKC L. Rev. 101, 102 n.10 (2007) ("Compensation and punishment are not policy goals of the slayer rule.")

[35] Because of my decision here, I need not address whether the rule advocated by the Administrator would run afoul of the United States Constitution, or the Delaware Constitution. *See* Sneddon, *supra* at 104–06 (discussing the slayer doctrine in terms of prohibited attainder under US Const.

Accordingly, the Slayer Statute, and its common-law analog, find no application here. The Administrator should present a form of order for distribution of George's estate consistent with this Opinion.

---

art. III, § 3); Del Const. art I, § 15 (prohibiting an attainder from "work[ing] corruption of blood or . . . forfeiture of estate").